IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-102

No. COA20-191

Filed 6 April 2021

Brunswick County, Nos. 14CRS052366, 18CRS002459-61

STATE OF NORTH CAROLINA

v.

JAY JOHNSON WAUGH, JR.

Appeal by Defendant from judgments entered 5 November 2019 by Judge James Greg Bell in Brunswick County Superior Court. Heard in the Court of Appeals 9 February 2021.

> *Attorney General Joshua H. Stein, by Assistant Attorney General Chris D. Agosto Carreiro, for the State-Appellee.*
>
> *Epstein Law, by Drew Nelson, for Defendant-Appellant.*

COLLINS, Judge.

Defendant appeals judgments entered upon his convictions for rape of a child, indecent liberties with a child, and sexual offense with a child. Defendant argues that the trial court plainly erred by allowing the admission of certain testimony that the minor child's symptoms were consistent with sexual abuse. We discern no plain error.

## I.    Procedural History

Defendant was convicted by a jury on 5 November 2019 of one count of rape of a child, one count of indecent liberties with a child, and eight counts of sexual offense with a child.  The trial court issued four judgments to run consecutively.  Defendant timely entered oral notice of appeal.

## II.    Factual Background

Defendant is the father of two children, Paige and Jessie.[1]  Defendant lived with his mother and his step-father.  Paige, who was no longer a minor child at the time of trial, stayed with Defendant every weekend from as far back as she could remember until she was seven years old.  Paige testified that Defendant forced her to perform oral sex on him at least once a weekend, starting when she was around four years old until she was seven years old.  Defendant also had penetrative sex with her when she was four or five years old and performed oral sex on her when she was approximately five years old.  Jessie testified that when she was three or four years old, Defendant took her to his friend's house, exposed himself to her, and told her to touch his genitals.

When Paige was nine years old, she told her best friend about the sexual abuse while they were playing at an arcade center.  A few years later, Paige told her friends

---

[1] Pseudonyms have been used to protect the identity of the children.

at a sleepover about the sexual abuse, and Paige's friend told her mother about the abuse.  A few years after that, Paige told her mother about the sexual abuse.

¶ 5        Taanya Mannain, a licensed independent social worker for seventeen years and Director of Behavioral Health Services at Little River Medical Center, was Paige's therapist from 2016 to 2017.  In March of 2017, Paige told Mannain about the sexual abuse.  Mannain testified that Paige had difficulty sleeping, poor appetite, anxiety related to school, significant feelings of low self-worth, and thoughts of committing self-harm.  When asked by the prosecutor, Mannain confirmed that these symptoms were consistent with the disclosure of suffering sexual abuse.  Mannain also testified that Paige expressed anxiety, shame, and guilt about reporting anything to law enforcement because she did not want to disrupt Defendant's sobriety and new life.

¶ 6        Lieutenant April Cherry of the Brunswick County Sheriff's Office testified that on 29 December 2017, the sheriff's office received an email from the Brunswick County Department of Social Services ("DSS") that Paige had reported sexual abuse by Defendant to her therapist, and that the therapist had reported it to DSS.  The sheriff's office referred Paige to the Carousel Center, a Child Advocacy Center, where she was examined by Mary Beth Koehler, a pediatric nurse practitioner and a child medical provider at the Carousel Center.  Koehler testified, without objection, "as an expert in the field of pediatrics, child abuse pediatrics, with a specific focus on child

medical examinations, child abuse and maltreatment." Based on her medical examination of Paige in February of 2018, Koehler was of the opinion that Paige's symptoms, characteristics, and history were consistent with the general characteristics of children who have been sexually abused.

### III. Discussion

¶ 7 Defendant's sole argument on appeal is that the trial court plainly erred by allowing Mannain to testify that Paige's symptoms were consistent with sexual abuse.

¶ 8 Defendant acknowledges his failure to object to the challenged testimony at trial but specifically and distinctly argues plain error on appeal. *See* N.C. R. App. P. 10(a)(4). "For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial." *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (citation omitted). To show fundamental error, a defendant must establish that the error "had a probable impact on the jury's finding that the defendant was guilty." *Id.* (quotation marks and citations omitted). In determining whether the admission of improper testimony had a probable impact on the jury's verdict, we "examine the entire record" of the trial proceedings. *State v. Odom*, 307 N.C. 655, 661, 300 S.E.2d 375, 379 (1983).

¶ 9 "[E]xpert testimony on the symptoms and characteristics of sexually abused children is admissible to assist the jury in understanding the behavior patterns of

sexually abused children." *State v. Hall*, 330 N.C. 808, 817, 412 S.E.2d 883, 887 (1992) (citing *State v. Kennedy*, 320 N.C. 20, 32, 357 S.E.2d 359, 366 (1987)). "Only an expert in the field may testify on the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent with this profile." *Hall*, 330 N.C. at 818, 412 S.E.2d at 888 (citations omitted). An expert witness is one who is qualified "by knowledge, skill, experience, training, or education[.]" N.C. Gen. Stat. § 8C-1, Rule 702(a) (2019).

¶ 10 In his brief, Defendant identifies the testimony he alleges was erroneously admitted as follows:

> Mannain testified that [Paige's] "worsening anxiety", her "history of self-harm", and her "perfectionist attitude toward school" all "made sense when [Paige] disclosed [the alleged abuse]." . . . She further connected [Paige's] "feelings of shame and her low self-worth" to [Paige's] decision to accuse her father of the alleged prior sexual abuse, and testified that the disclosure of the alleged abuse "provide[d] at least a good explanation for all of her symptoms."

¶ 11 We need not determine whether the challenged testimony was admissible because, even assuming error *arguendo*, Defendant has failed to show that the error "had a probable impact on the jury's finding that the defendant was guilty." *Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334 (quotation marks and citations omitted).

¶ 12 At trial, both Paige and Jessie testified about sexual abuse Defendant perpetrated against them. The jury had the opportunity to observe Paige and Jessie

and to evaluate their credibility.  Paige testified that she slept with her father in the

back bedroom when she visited him.  She further testified:

> The first memory I have was I walked into the back
> bedroom.  I didn't knock.  I just busted in the room.  I was
> young.  I was 4.  I remember I was excited about going to
> Head Start, and he was touching himself underneath the
> blanket with the–he had a computer laptop.  He was
> watching porn when I walked in.  He told me to come in
> and shut the door.  So, I did, and he showed me what was
> on the computer screen, and it was a girl that looked like
> me.  She looked young, and she was giving oral to a man.
> And he asked me if I would do that, and then, I don't
> remember my answer.  I don't remember if I even did
> answer, but I remember him, you know, having my head
> and showing me, you know, to lick, and it felt good, and this
> was our little secret and stuff like that.  So and I don't feel
> like that was the first time it happened because I
> remember being scared, but I wasn't surprised.  I can't say
> for a fact that that was the first time, but that's the first
> time I remember vividly.

¶ 13    When asked some follow-up questions, Paige clarified:

> I remember him having my hand and, you know, I was
> obviously smaller than him, and so I was around level, and
> he would tell me to put his hand, to, you know, hold and
> not squeeze. . . . Hold his penis. . . . [A]nd he told me then
> to give it a little lick and things like that. . . . I did.

¶ 14    Paige further testified:

> He used to tell me he was in pain, . . . and that this made
> him feel better, and he'd tell me, "Come here and let me --
> let me show you.  Let me teach you, you know, how to help
> your daddy, how to make Daddy feel better." . . . He would
> normally remove all my clothing and have me either give
> him a hand job or give him oral sex.

¶ 15    Paige estimated that Defendant made her perform oral sex on him "at least once a weekend, if not multiple times a weekend. Sometimes once a day. Sometimes multiple times a day. Every weekend until I was 7." Defendant would ejaculate in her mouth and ask her to "swallow it." When she was seven, Defendant got arrested for doing drugs and Paige didn't see him again until she was nine years old.

¶ 16    When asked if there were any other things that Defendant tried to make her do or tried to do to her, Paige responded, "Yes. I only remember one time, and I can't forget the time he tried to have penetrative sex with me." Paige expounded that when she was four or five years old,

> I had -- well, it was originally a pair of jeans that became high waters on me, but I loved them so much because they had bedazzled butterflies on them that I cut them into shorts. . . . But I remember I was wearing my little denim shorts I had cut, and I loved those shorts. I loved them so much. But he took them off of me. I remember I could see myself in the full mirror closet that we had, and he said he wanted to try something. And so he had me -- I was on the edge of the bed, and he put me towards the head of the bed. And so, I was laying down with my knees up, and he came with his knees on the bed, and he would try to get his penis inside of me, and I remember, like, it being, like, pressure, a lot of pressure, and I would say, you know, "Daddy, this hurt. Daddy, I'm hurt. Daddy, I'm not big enough yet. Daddy, it hurts," and he told me -- he had told me, like we had talked about before how, like, I had to stretch, and that, you know, I'd feel it a little bit, like he had discussed it with me, and I told him I just wasn't big enough yet, and that it hurt and that it hurt really bad. I kept saying, "Ow, Daddy, ow." And so he stopped. He was even mad. He was, like, he was, like, "Well, if you're not going to do that"

he had me do oral until he finished. I didn't want to. I just kept asking if we could go to the park with the blue seahorse. I know he knows the one I'm talking about. And I kept asking if we could go there and just go there, and he said, "Yes, in a minute, in a minute, when you're finished, when you're finished." And so he made me go, hand on the back of my head until I made him finish. And then we left the room, and he took me to the park like nothing happened.

¶ 17 When asked why she didn't call for her grandparents, Paige responded, "My dad had always told me that it was our little secret" and that "he'd go to jail and he'd probably die or my mom would kill him" if she told someone. Paige testified,

I knew that something would happen, and so I was scared. I just -- I tried to just pretend like everything was normal and not tell anybody. Keep it inside. And so, I didn't tell my [grandparents] because I didn't want anybody to know. I didn't want anyone to know. . . . Because that's not what I wanted my story to be. I felt embarrassed and disgusted with myself, and I still do. I felt like -- I felt like I might even be in trouble if I told, so I just -- I didn't . . . .

¶ 18 When Paige was nine years old, she decided she could share her secret with her best friend Patty.[2] While they were at an arcade, she told Patty that Defendant had "messed with" her, but made Patty pinky swear not to tell anyone. When Paige was about eleven years old, she told her close friend Regina[3] about the abuse. Regina also promised not to tell anyone. Approximately two years later, Paige told another

---

[2] A pseudonym is used to protect the identity of the child.
[3] A pseudonym is used to protect the identity of the child.

friend about the abuse while they were at a sleepover.

When Paige was a sophomore or junior in high school, she began having repeated nightmares about the sexual abuse. After her teacher confronted her about dozing off in class, Paige realized that her mental health was "deteriorating fast," she could not help herself, and that she needed to get help for "what was done to [her]." She testified,

> I texted my dad, and I told him that I'm sorry and I hope he understands that I do not hate him. I still do not hate you. I needed help and I had to tell somebody. So I told him that I would be telling my mom, and so I could get some help, and he replied almost immediately saying that he would not go back to jail, that he would do anything to stay out of jail, and he advised me not to tell anyone.

Jessie testified that when she was three or four years old, Defendant took her to a friend's house. No one was there when they got there. Defendant went into the kitchen and "pulled out a thing out of the drawer, and he put it on his thingy."

> It was purple, and before he had stretched it out, it was a circle, and it was rubber, it was a circle, and it was purple. And then he, like, stretched it out and put it over his -- word I really don't want to say. He put it over that, and then he told me that if I go up and down on it, the lotion will come out.

She testified that he pulled down his pants, pulled up his shirt, lay down on the rug, and "he had put the thingy on his thing." Defendant "then heard [his friend's] car pull up, and he pulled his pants up real fast, and he told me not to tell nobody

what had happened." Jessie testified that she learned when she got older that the purple rubber circle was a condom and she clarified that Defendant put the condom on his penis.

¶ 22    Paige's friends, mother, and the other law enforcement witnesses testified about Paige's behavior before and after the sexual abused occurred. This testimony corroborated Paige's testimony.

¶ 23    Patty described when Paige first told her about the abuse. "[S]he said, 'My dad touched me,' and at the time we were little, so I didn't know -- I knew it was not good because she looked upset when she was saying it . . . . She made me promise I wouldn't tell anybody, and so, I didn't tell anyone." Tina[4] testified that Paige disclosed during a sleepover at Tina's house that Defendant had "messed with" Paige. Tina testified that Paige looked sick and that Tina "just felt like she needed help and . . . felt like the right thing to do was to tell [my] mom [that Paige] needed help."

¶ 24    Paige's mother recalled the day that Paige told her about Defendant's sexual abuse. "[S]he goes, 'Mom, he touched me,' and I just started crying and I held her. "[W]e were both -- I was hysterical, but it seemed like she was just relieved to tell me." Prior to this conversation, Paige's mother had taken Paige to a therapist and other medical professionals because Paige had been engaging in self-harm, reporting

[4] A pseudonym is used to protect the identity of the child.

suicidal thoughts, and experiencing heart palpitations that would bring Paige to her knees.

¶ 25        Both Morgan Traynham, a social worker with Brunswick County Child Protective Services, and Cherry testified that Paige told them that she believed if she endured the sexual abuse, Defendant would not hurt Jessie.  Cherry's notes from an interview with Paige state that Paige described the oral sex Defendant forced her to perform as "gross" and that she felt she would throw up but "eventually realized if you go with it, it gets over quicker."

¶ 26        Finally, the State tendered Koehler "as an expert in the field of pediatrics, child abuse pediatrics, with a specific focus on child medical examinations, child abuse and maltreatment."  Without objection, Koehler was accepted by the trial court as such. Koehler testified that she conducted a child medical examination on Paige in February of 2018 and completed a report based upon the examination.  The report was admitted into evidence without objection.

¶ 27        Koehler first interviewed Paige's mother.  In that interview, Paige's mother "reported that she had found some razors, and that she thought [Paige] was self-injuring at that time and may have had some issues.  She had had behaviors that the mother was concerned about anger.  Not aggression, but a lot of anger. . . ."

¶ 28        Koehler then interviewed Paige.  During the interview, Paige told Koehler that Defendant "put his penis in my mouth.  This happened almost every time I saw him

until he went to jail when I was 7[;]" Defendant touched "[m]y vagina with his hand and his mouth[;]" and "[o]ne time he tried to put a finger in me, but it hurt and he stopped. And one time he tried to put his penis in me, and that really hurt and he stopped." Koehler also testified that Paige reported bedwetting behaviors that stopped around age eight, after the abuse had stopped.

¶ 29     Koehler then conducted a complete physical examination. She noted some linear marks on Paige's skin that were consistent with Paige's explanation that they were from previous cutting and self-injury behavior. Paige's "genital exam was within normal limits" meaning that there were no signs of injury, infection, or scarring. Koehler testified that this result was not unusual and that "[i]n about 95 to 97 percent of cases there [are] no findings at all. . . . That part of our body is made to heal very quickly, and in general, even if there [are] injuries, the injuries heal within about two to four days." Koehler testified that the lack of physical injury was consistent with the type of alleged sexual behavior and the amount of time that had passed since the abuse took place.

¶ 30     Koehler acknowledged that she was familiar with the profile evidence of the general characteristics of children who have been sexually abused and testified that behaviors such as depression, anxiety, problems sleeping, nightmares, bedwetting, self-injury behaviors, and suicidal thoughts may be connected to abuse. Additionally, Koehler testified that there are a lot of reasons why children delay talking about

abuse when it first happens, and that a younger child may delay reporting sexual trauma because "they just may not actually have the ability to say what exactly is happening to them." At the end of direct examination, the prosecution asked,

> You testified earlier and described for the jury the profile evidence of the general characteristics of children who have been sexually abused. In reviewing all the information that you have from [Paige's] visit to the Carousel Center, are [Paige's] symptoms and characteristics, as well as the history provided to you, consistent with those general profile characteristics?

Koehler responded, "Yes."

¶ 31    In light of the overwhelming evidence of Defendant's guilt, including Paige's testimony, Jessie's testimony, and Koehler's expert testimony that Paige's symptoms and characteristics, as well as her history, were consistent with the profile evidence of the general characteristics of children who have been sexually abused, we conclude that even had the challenged testimony not been admitted, the jury probably would not have reached a different result. *See State v. Walker*, 316 N.C. 33, 39, 340 S.E.2d 80, 83 (1986).

## IV.    Conclusion

¶ 32    The trial court did not plainly err by allowing the admission of Mannain's testimony that Paige's symptoms were consistent with sexual abuse.

NO PLAIN ERROR.

Judges MURPHY and JACKSON concur.